**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FILED

JAN 2 2 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

|  |  |
|---|---|
| **CHEMINOVA A/S** | ) |
| | ) |
| Applicant, | ) |
| | ) |
| v. | )    **Civil Action No. 01-02139 (ESH)** |
| | ) |
| **GRIFFIN L.L.C.,** | ) |
| | ) |
| Respondent. | ) |

## MEMORANDUM OPINION

Applicant Cheminova A/S has requested judicial confirmation of a final arbitration order issued pursuant to the data-sharing provisions of the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 *et seq.* ("FIFRA" or the "Act"). Respondent Griffin L.L.C. has countered by moving to dismiss on the grounds that neither FIFRA, the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA"), nor the Administrative Dispute Resolution Act, 5 U.S.C. § 571 *et seq.* ("ADRA"), provides authority for judicial enforcement of FIFRA arbitration awards; and that even if Congress had authorized judicial enforcement, due process concerns require this Court to decline to enforce this award. As detailed below, the plain meaning of Section 3(c)(1)(F) of FIFRA and the arbitration rules promulgated thereunder compel the conclusion that arbitration awards are judicially enforceable. Furthermore, due process concerns do not prevent judicial enforcement. Respondent's motion to dismiss will therefore be denied, and the final arbitration order will be confirmed.



20

## BACKGROUND

In 1996, Griffin L.L.C. ("Griffin") applied to the United States Environmental Protection Agency ("EPA") for registrations to sell pesticides containing malathion.  Instead of submitting its own data to support its registration application, Griffin chose to take advantage of FIFRA's data-licensing provision, Section 3(c)(1)(F), which permits an applicant to rely on data submitted by a prior registrant without that registrant's permission.  7 U.S.C. § 136a(c)(1)(F).  Griffin relied on and cited to 118 studies previously submitted to EPA by Cheminova A/S ("Cheminova").  As required by statute and regulation, Griffin offered to compensate Cheminova for the use of its data and certified to the EPA that it had done so.  (Cheminova's Response to Opposition of Griffin to Application to Confirm Arbitration Award [hereinafter App.'s Opp.] at 3-4.)  In six separate letters, Griffin offered to compensate Griffin "to the extent required by FIFRA section 3(c)(1)(F)."  (App.'s Opp., Ex. A.)  In 1998, Griffin received its registrations from the EPA and began selling malathion.

After the parties failed to reach an agreement as to the compensation owed for the data, Cheminova requested binding arbitration.  (App.'s Opp. at 5; Griffin's Motion to Dismiss [hereinafter Resp.'s Mot.] at 5.)  The arbitration proceedings, in which both Griffin and Cheminova participated fully, lasted for approximately eighteen months.  Initial statements were filed at the end of 1999 and the beginning of 2000, and both parties participated in the disclosure and discovery process, as well as pre-hearing proceedings to resolve discovery disputes.  After six months of discovery, the three-member arbitration panel conducted a full evidentiary hearing in Washington, D.C.  The hearings spanned a total of 11 days in September and December 2000.  Both parties presented evidence and a total of 16 witnesses testified.  Post-hearing briefs were

2

filed, and closing arguments were held before the arbitration panel on March 20, 2001. On March 25, 2001, the panel issued a Provisional Arbitration Award and invited comment from the parties.

Over the course of the arbitration proceedings, both parties presented evidence regarding, inter alia, the costs of producing or replacing the data relied upon, as well as Griffin's historic and expected sales of and profits from malathion products. Griffin argued that its smaller market share justified a reduction in compensation. Griffin also noted that a fire that had broken out at a supplier's plant in Mexico in September 2000 had reduced its ability to produce malathion products. Griffin asserted that even if the plant could meet demand, its return on the product line would be minimal. (Resp.'s Mot. at 6.) Cheminova responded that Griffin's experience and marketing prowess would enable it to expand its market share,[1] and that in any event, market share was not relevant because Griffin enjoyed an equal opportunity to compete in the malathion market. (Id.)

After considering this and other evidence, the arbitration panel entered a final award on June 29, 2001. It directed Griffin to pay to Cheminova: (1) $13,264,090 by August 15, 2001; (2) interest through the earlier of August 15, 2001 or the date of payment; and (3) interest after August 15 for any amount outstanding. (Resp.'s Mot. at 5.) According to the final arbitration decision, that figure was based on an assessment of the costs incurred by Cheminova and its predecessor-in-interest in generating the data actually relied on by Griffin. Those costs were adjusted for inflation and assessed between the parties on an almost equal share basis because the

---

[1] 51% of Griffin is owned by E.I. DuPont de Nemours Co., one of the largest chemical companies in the world. (Griffin's Opposition to Application to Confirm Arbitration Award [Resp.'s Opp.], Ex. F at 6.)

arbitration panel concluded that allocating costs on the basis of market opportunity best effectuated FIFRA's goals.  (Resp.'s Opp., Ex. F at 15-17.)

On October 15, 2001, Cheminova applied to this Court for confirmation of the final arbitration award.  In response, Griffin filed an opposition to the application and a motion to dismiss the proceedings, arguing that neither federal statute nor the United States Constitution permits summary judicial enforcement of arbitration awards under FIFRA.  Cheminova filed its response on November 20, 2001, arguing that FIFRA, the FAA, and the ADRA provide authority to confirm the arbitration award, and that there is no constitutional impediment to judicial enforcement.

**ANALYSIS**

**I.  The FIFRA Arbitration Mechanism**

Since 1970, pesticide manufacturers have been required to register their products with the EPA prior to sale or distribution.  See 7 U.S.C. § 136a(a).  In order to obtain a registration, an applicant must demonstrate, inter alia, that its pesticide will not cause "unreasonable adverse effects on the environment."  7 U.S.C. § 136a(c)(5).  To meet this burden, registrants must either (1) submit their own test data or (2) cite to "data that appear in the public literature or that previously had been submitted to the Administrator."  7 U.S.C. § 136a(c)(1)(F).  If a manufacturer elects to take advantage of the second option and rely on a prior registrant's data without its permission, EPA may consider the data submitted by the citing applicant (the "follow-on" or "me-too" registrant) "only if the applicant has made an offer to compensate the original data submitter."  7 U.S.C. § 136a(c)(1)(F)(iii).  EPA regulations require a follow-on applicant to

4

"offer to pay the [original data submitter] compensation to the extent required by FIFRA Section 3(c)(1)(D)" and advise EPA that it has done so.  40 C.F.R. § 152.93(b)(2)(iii).[2]

If the original data submitter and the follow-on registrant cannot reach a negotiated agreement regarding compensation, either party may initiate "binding arbitration proceedings." 7 U.S.C. § 136a(c)(1)(F)(iii).  Prior to 1978, under the original data-licensing provision, if the parties could not reach agreement, EPA determined the appropriate compensation.  However, in 1978, in order to respond to "the logjam of litigation that resulted from controversies over data compensation and trade secret protection," Congress amended FIFRA to create the current arbitration mechanism.  Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 573 (1985) (internal quotation marks omitted).  Congress concluded that "EPA must be relieved of the task of [compensation] valuation because disputes regarding the compensation scheme had 'for all practical purposes, tied up their registration process,' and '[EPA] lacked the expertise necessary to establish the proper amount of compensation.'  123 Cong.Rec. 25709 (1977) (statement of Sen. Leahy, floor manager of S. 1678)."  Id.  The arbitration mechanism was the chosen alternative because legislators and the EPA agreed that compensation "[did] not require active government involvement . . . [and] should be determined to the fullest extent practicable, within the private sector."  Id. (internal quotation marks omitted).

Under the 1978 amendments, the selection of arbitrators and the arbitration proceedings are governed by the rules adopted by the Federal Mediation and Conciliation Service ("FMCS"). 7 U.S.C. § 136a(c)(1)(F)(iii).  Although FIFRA does not explicitly provide for judicial

---

[2] As part of the 1991 amendments to FIFRA, the data compensation provisions were moved from Section 3(c)(1)(D) to Section 3(c)(1)(F), but the regulation has not yet been updated.

confirmation of arbitration awards, Section 37(c) of the FMCS rules, which was adopted by

FMCS in 1980, states that the parties "shall be deemed to have consented that judgment upon the

arbitration award may be entered" in federal or state court.  29 C.F.R. Part 1440, App. § 37(c).


## II.  Judicial Enforcement of Final Arbitration Orders

Federal policy and the law of this Circuit strongly favor judicial confirmation of binding

arbitration decisions.  See, e.g., Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79,

91 (2000); Revere Copper and Brass, Inc. v. Overseas Private Inv. Corp., 628 F.2d 81, 84 (D.C.

Cir. 1980).  Despite this clear preference, Griffin claims that this Court lacks jurisdiction to

enforce an arbitration award issued under the procedures established by FIFRA because the

statute provides only an administrative remedy for a registrant's failure to comply with an award.

This appears to be a question of first impression, even though the FIFRA arbitration scheme has

been in effect since 1978 and courts have historically enforced arbitration awards thereunder.

See, e.g., Gowan Co. v. Mevinphos Task Force, No. 87-06738 (C.D. Cal.) (December 30, 1987

Order Confirming Arbitrator's Award of August 25, 1987 and March 7, 1988 Judgment Pursuant

to Order Confirming Arbitrator's Award).

Since its adoption, the Supreme Court has twice rejected constitutional challenges to

FIFRA.  In Ruckelshaus v. Monsanto Co., 467 U.S. 986 (1984), the Court decided that the Act's

data-sharing provision did not effect an uncompensated taking in violation of the Fifth

Amendment for data submitted after the 1978 amendments.  467 U.S. at 1006-08.  One year later,

in Thomas v. Union Carbide Agricultural Products Co., 473 U.S. 568 (1985), the Court revisited

the FIFRA data-sharing scheme and rejected an Article III challenge to Congress's choice of

binding arbitration as the mechanism for resolving compensation disputes among FIFRA registrants. 473 U.S. at 571. Nevertheless, the Court in <u>Union Carbide</u> specifically reserved the question of judicial enforcement of FIFRA arbitration awards: "We need not decide in this case whether a private party could initiate an action in court to enforce a FIFRA arbitration." 473 U.S. at 591. Almost seventeen years later, that question is at issue here.

In light of FIFRA's unambiguous language and because judicial enforcement is necessary to effectuate the statute's express goals, it must be concluded that FIFRA confers jurisdiction on the judiciary to enforce arbitration awards. The statute's language is clear: if a follow-on registrant chooses to rely on another registrant's data, and the registrants cannot agree on compensation, FIFRA permits either registrant to initiate "<u>binding</u> arbitration proceedings." 7 U.S.C. § 136a(c)(1)(F)(iii) (emphasis added). This language requires the registrants to determine their respective rights and duties with respect to compensation through arbitration. FIFRA further mandates that the arbitrator's findings and determinations are "final and conclusive." <u>Id.</u>

These terms "binding" and "final and conclusive" are understood to mean that an award will be enforceable in court. "To agree to binding arbitration is to agree that if your opponent wins the arbitration he can obtain judicial relief if you refuse to comply with the arbitrator's award." <u>Lander Co. v. MMP Investments, Inc.</u>, 107 F.3d 476, 480 (7th Cir. 1997) (holding that consent to binding arbitration waived argument that court's jurisdiction to enforce the award had been waived).[3] In 1978, the very year that FIFRA was amended, the Second Circuit observed

---

[3] Griffin attempts to distinguish <u>Lander</u>, arguing, <u>inter alia</u>, that the case does not concern FIFRA, a government-mandated licensing scheme, or the possibility of enforcement through administrative, state, and federal remedies. (Resp.'s Reply at 5 n.6.) However, the absence of

that a party who has participated fully in arbitration "can hardly avow that an award will be 'final, conclusive, and binding' upon it without implicitly agreeing that federal court intervention may be sought to compel compliance." Kallen v. District 1199, Nat'l Union of Hosp. and Health Care Employees, 574 F.2d 723, 726 (2d Cir. 1978) (holding that participation in arbitration pursuant to collective bargaining agreement provision stating that arbitrator's award would be "final, conclusive, and binding" was sufficient to establish consent to enter judgment on an arbitration award under 9 U.S.C. § 9).

The use of these terms in an agreement between private parties is tantamount to consent to judicial enforcement; their use in Section 3(c)(1)(F)(iii) should not convey a different meaning. This Court must assume that, absent a plain indication to the contrary, Congress intended the FIFRA arbitration scheme to fit within existing arbitration law. Because the enforceability of arbitration agreements and awards was well-established in 1978, see, e.g., Kallen, 574 F.2d 723, this Court is not free to ignore the plain import of the terms "binding arbitration proceedings" and "final and conclusive." See Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979) (the court must "give effect, if possible, to every word Congress used"); see also National Ass'n of Recycling Indus., Inc. v. Interstate Commerce Comm'n, 660 F.2d 795, 799 (D.C. Cir. 1981) ("[I]t is a fundamental principle of statutory construction that effect must be given, if possible, to every word, clause and sentence of a statute so that no part will be

---

these factors does not diminish the significance of Lander. Lander explicates the commonly understood meaning of "binding" in the arbitration context, a meaning which was clearly established at the time of the 1978 amendments to FIFRA, see, e.g., Kallen v. District 1199, Nat'l Union of Hosp. and Health Care Employees, 574 F.2d 723, 726 (2d Cir. 1978), is supported by FIFRA's reference to arbitrator determinations as "final and conclusive," and is not altered by the availability of alternative remedies.

inoperative or superfluous, void or insignificant.") (internal quotation marks omitted).  Finally, because Griffin took advantage of FIFRA's data-sharing provision with full knowledge that it might be subject to "binding arbitration" and that any award would be the "final and conclusive" determination concerning compensation, it is difficult to understand how it can now plead that judicial enforcement would be unfair or unexpected.

Moreover, the purposes of the statute would be defeated if arbitration awards are not judicially enforceable.  The primary purpose of the data-sharing provision is to guarantee compensation to original data submitters for the compelled use of their data.  Section 3(c)(1)(F)(iii) requires an offer to compensate be made before a prior registrant's data may be considered by EPA in a follow-on application and provides for arbitration to ensure that compensation is paid when the parties cannot reach an agreement.  7 U.S.C. § 136a(c)(1)(F)(iii). As the Union Carbide Court observed:  "It is evident that Congress linked EPA's authority to issue follow-on registrations to the original data submitter's ability to obtain compensation."  473 U.S. at 582.  Without judicial enforcement, there would be no assurance that an original data submitter would be paid.

In response, Griffin argues that compensation is available to aggrieved data submitters from the federal government by way of a lawsuit under the Tucker Act, 28 U.S.C. § 1941. (Resp.'s Mot. at 17-18.)  However, that remedy is not in fact available, and even if it were, its availability would not preclude judicial enforcement.  The Tucker Act grants jurisdiction to the Court of Federal Claims to hear claims against the United States on the basis of the Constitution, an Act of Congress, regulations of executive departments, and contracts with the United States. 28 U.S.C. § 1491.  As an initial matter, it is unlikely that Congress intended the Tucker Act to

provide the mechanism for redress of arbitration award non-compliance, since Section

3(c)(1)(F)(iii) requires that compensation be paid by the follow-on registrant, not the United

States.  A Tucker Act suit would thus be a poor substitute for an arbitration award, for it would

only provide reimbursement to the original data submitter for the use of its data, but the follow-

on registrant would enjoy a free ride at the public's expense.

Additionally, the Tucker Act is solely jurisdictional; it does not create a substantive right

to money damages.  United States v. Mitchell, 463 U.S. 206, 216-17 (1983).  Under the Supreme

Court's ruling in Ruckelshaus, Cheminova has no right to money damages for the appropriation

of its data, for FIFRA's data-sharing provision does not effect an uncompensated taking under

the Fifth Amendment for data submitted after 1978.  467 U.S. 1006-08.  Because Griffin cited no

data submitted prior to 1984 (App.'s Opp. at 37), Cheminova has no takings claim, and thus, it

has no substantive right to money damages under the Tucker Act.[4]

Furthermore, even if it were arguable that suit could be brought under the Tucker Act, the

absence of judicial enforcement would frustrate Congress's attempt to streamline the data-

licensing and registration process and thereby avert "[t]he near disaster of the FIFRA 1972

amendments" and the "danger to public health" attendant on registration delays.  Union Carbide,

473 U.S. at 590.  Congress selected arbitration to break the "logjam of litigation" that had

erupted under the pre-1978 data-sharing scheme.  Id. at 573 (internal quotation marks omitted).

_____

[4] Griffin relies on Union Carbide, Ruckelshaus, and other cases to argue that the Tucker
Act would provide redress if there had been an uncompensated taking as a result of the data-
sharing scheme.  (Resp.'s Mot. at 17-18).  However, pesticide data voluntarily submitted after
1978 cannot form the basis for a takings claim.  Ruckelshaus, 467 U.S. at 1006-07; Union
Carbide, 473 U.S. at 585.  Without a viable takings claim, the Tucker Act will be of no help to
Cheminova.

Without enforceable arbitration awards, original data submitters will be forced to bring additional lawsuits (if available) or initiate administrative proceedings, spawning new litigation and making the initial arbitration a relatively meaningless exercise, thereby gutting the very purpose of the Act.

Additionally, Congress designed Section 3(c)(1)(F) to avoid EPA involvement in compensation decisions; whereas Griffin's interpretation would return compensation disputes to the EPA whenever a registrant elected not to pay an arbitration award.  Congress chose to eliminate EPA's involvement because the agency "lacked the expertise necessary."  Id.  To this end, Congress chose not to specify a compensation standard in the 1978 amendments; EPA lacked the expertise to craft one, and Congress believed that determination of compensation did not require "active government involvement."  Id.  Although Section 3(c)(1)(F)(iii) permits registrants to petition EPA when a registrant refuses to engage in arbitration or pay an award, 7 U.S.C. § 136a(c)(1)(F)(iii), the agency can only cancel a non-compliant party's registration, it cannot order that compensation be paid.  Thus, EPA manages the registration process, and compensation is left to the arbitration process.

Contrary to Griffin's suggestion, nothing in FIFRA indicates that this administrative remedy, registration cancellation, supplants or precludes judicial enforcement.  Under FIFRA, EPA may cancel a follow-on applicant's registration if the applicant fails to pay compensation awarded in arbitration.  Section 3(c)(1)(F)(iii) provides:

> Notwithstanding any other provision of this subchapter, if the Administrator determines that an applicant has . . . failed to comply with the terms of an agreement or arbitration decision concerning compensation under this subparagraph, the Administrator shall deny the application or cancel the registration of the pesticide in support of which the data were used without further

hearing.

7 U.S.C. § 136a(c)(1)(F)(iii).[5]  Regulations implementing this section allow an original data supplier to petition the EPA to cancel a follow-on registration.  40 C.F.R. § 152.99(a)(1)(iv). However, the availability of cancellation does not mean that Congress intended to bar judicial enforcement.  First, the introductory clause to Section 3(c)(1)(F)(iii) – "Notwithstanding any other provision of this subchapter" – provides evidence that Congress did not intend to make cancellation the exclusive remedy for failure to comply with an arbitration order.  This language would be mere surplusage if there were no other remedies available under FIFRA to enforce an arbitration decision.  Rather, it is obvious that cancellation was provided as an alternate remedy.

Additionally, as this case illustrates, registration cancellation is not by itself an adequate remedy.  Griffin argues that if its registration is revoked, it will no longer be able to sell malathion, and suggests that the severity of the sanction is more than sufficient to ensure FIFRA compliance.  (Resp.'s Mot. at 9, 16-17.)  However, that revocation would come more than three years after Griffin received its registration and began selling malathion pesticides.  It is difficult to imagine that Congress intended to permit a manufacturer, even for a limited period of time, to sell pesticides under a registration based on another party's data without compensating that party, and to thus enjoy a "free ride" at a prior registrant's expense.

Griffin also argues that judicial enforcement is inconsistent with the Supreme Court's opinion in Union Carbide.  (Resp.'s Mot. at 4-5, 7-8; Resp.'s Reply at 3).  Griffin, however, reads too much into this decision.  The Union Carbide Court explicitly declined to decide the

_____

[5] Registration cancellation is also available if a registrant or follow-on registrant refuses to participate in arbitration.  7 U.S.C. § 136a(c)(1)(F)(iii).

matter because resolution of the enforcement issue was unnecessary to decide the constitutional question. 473 U.S. at 591. Thus, comments by the Court bearing on the issue are dicta.

Moreover, the tenor of Union Carbide is favorable to judicial enforcement. Admittedly, the Court recognized that unlike many federal statutes, "FIFRA contains no provision explicitly authorizing a party to invoke judicial process to compel arbitration or enforce an award." Id. at 591. The Court, however, also affirmed that the arbitration proceedings are binding and designed to ensure compensation. Id. at 590-93; see also Ruckelshaus, 467 U.S. at 1019 (observing that the arbitration scheme operates to vindicate a "statutory right to obtain compensation from a subsequent applicant whose registration application relies on data.") As discussed above, without judicial enforcement, awards would not be binding and an award of compensation could be illusory.

Statements by the Union Carbide Court on the limited nature of judicial involvement are also entirely consistent with judicial confirmation and enforcement. See Union Carbide, 473 U.S. at 591, 594. FIFRA cabins the scope of judicial review of arbitration awards: a federal court can only overturn an arbitration panel decision on the basis of fraud, misconduct, or misrepresentation. 7 U.S.C. § 136a(c)(1)(F)(iii). The decision to prevent the judiciary from reopening and revisiting compensation decisions underscores the congressional interest in ensuring the finality of those awards. That interest would be undermined, not furthered, if summary judicial confirmation and enforcement were unavailable.

Because Section 3(c)(1)(F)(iii) clearly expresses Congress's intent to permit judicial enforcement of arbitration panel decisions, FIFRA Arbitration Rule 37(c), which provides for judicial enforcement, cannot be *ultra vires*. Rule 37(c) states: "Parties to these Rules shall be

deemed to have consented that judgment upon the arbitration award may be entered in any Federal or State Court having jurisdiction thereof." 29 C.F.R. Part 1440, App. § 37(c).  This rule is entirely consistent with the FIFRA language stating that the "findings and determination of the arbitrator shall be final and conclusive, and no official or court of the United States shall have power or jurisdiction to review any such findings and determinations, except for fraud, misrepresentation, or other misconduct."  7 U.S.C. § 136a(c)(1)(F)(iii).

In this regard, Griffin cannot claim that it did not consent to binding arbitration when it relied on Cheminova's data.  "[U]nder FIFRA, the only potential object of judicial enforcement power is the follow-on registrant who <u>explicitly</u> <u>consents</u> to have his rights determined by arbitration."  <u>Union Carbide</u>, 473 U.S. at 592 (emphasis added).  This "explicit consent" is found in the written offer that all follow-on registrants must make as a prerequisite to taking advantage of the data-sharing program.  <u>See</u> 40 C.F.R. § 152.93(b)(2)(iii).  There is no dispute that Griffin made the required offer on six separate occasions.  (App.'s Opp., Ex. A.)  Griffin thereby consented to have its rights determined by binding arbitration, which necessarily entails a right to judicial enforcement of any award.  That the arbitration proceedings are required by federal statute does not vitiate Griffin's consent.  <u>See</u> <u>Union Carbide</u>, 473 U.S. at 592; <u>R.J. O'Brien & Associates, Inc. v. Pipkin</u>, 64 F.3d 257, 261 (7th Cir. 1995) (holding that "mandatory nature" of party's registration with the National Futures Association "does not obviate its consent to submit to its arbitration procedures").  Furthermore, FIFRA does not require Griffin's consent to arbitration as a precondition to registration, but only as a prerequisite to utilizing another registrant's data in a registration application.  Griffin could have submitted its own data to meet FIFRA registration requirements, but instead, it chose not to do so.

14

In sum, FIFRA provides for "binding arbitration" to effectuate the right to compensation that arises when a follow-on registrant benefits from the use of the data provided to the EPA by a prior registrant. Without recourse to judicial enforcement of the arbitration award, the original registrant's rights would be limited to cancellation, not compensation, as provided for by Congress. Therefore, if the phrase "binding arbitration" is not given its usual meaning, i.e., that the award is enforceable in court, FIFRA's data-compensation scheme could be rendered meaningless.[6]

## III. Constitutionality of Judicial Enforcement

Griffin claims that judicial enforcement "raises significant constitutional concerns" (Resp.'s Reply at 2), notwithstanding two Supreme Court opinions upholding FIFRA against constitutional challenge, and its own arguments supporting constitutionality as *amicus curiae* in both of those cases. (App.'s Opp. at 40 n.13.) When the Union Carbide Court reviewed the adequacy of judicial involvement under FIFRA and affirmed the arbitration mechanism, it answered many of Griffin's generic due process concerns. The Court held that the scope of review under FIFRA, while limited, "preserves the 'appropriate exercise of the judicial function.'" 473 U.S. at 592 (quoting Crowell v. Benson, 285 U.S. 22, 54 (1932)). The Court explained this conclusion:

> FIFRA at a minimum allows private parties to secure Article III review of the arbitrator's 'findings and determinations' for fraud, misconduct, or misrepresentation. § 3(c)(1)(D)(ii). This provision protects against arbitrators

---

[6] Given the Court's decision that it has jurisdiction pursuant to Section 3(c)(1)(F) of FIFRA to confirm the arbitration award, it need not determine whether jurisdiction is also available under FIFRA Section 16(c), the FAA, or the ADRA.

who abuse or exceed their powers or willfully misconstrue their mandate under governing law.  Moreover, review of constitutional error is preserved, and FIFRA, therefore, does not obstruct whatever judicial review might be required by due process.

Id. (internal citations omitted).  Given this statement, it is difficult to understand Griffin's argument that due process requires judicial review for "evidentiary errors, misinterpretations of applicable law and findings contrary to the clear weight of the evidence."  (Resp.'s Mot. at 11.) Whether or not the Constitution requires and FIFRA permits review for these specific errors, none has been alleged.  Because neither Griffin nor Cheminova has asked that the merits of the final arbitration award be revisited, this Court need not test the limits of judicial review under FIFRA.[7]

Griffin also claims that the arbitration panel did not consider if the award would be appropriate under changed circumstances, specifically if its registrations to sell malathion were cancelled or if it voluntarily left the malathion market.  (Resp.'s Mot. at 23-24.)  As an initial matter, FIFRA provides for review for "constitutional error," as well as "whatever judicial review might be required by due process."  Union Carbide, 473 U.S. at 592.  Moreover, as far as can be determined, these hypothetical possibilities have not occurred nor were they raised by

---

[7] Significantly, judicial review under FIFRA is not substantially more limited than review of purely private arbitration awards.  The confirmation process of private awards involves only limited substantive review "to avoid undermining the goals of arbitration, namely, settling disputes efficiently and avoiding lengthy and expensive litigation."  LaPrade v. Kidder, Peabody & Co., 94 F. Supp. 2d 2, 4-5 (D.D.C. 2000).  As the D.C. Circuit stated, "[Courts] 'are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact . . . .'"  Teamsters Local Union No. 61 v. United Parcel Service, Inc., 272 F.3d 600, 604 (D.C. Cir. 2001) (quoting United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 36 (1987)).  The Court continued: "We have repeatedly recognized that 'judicial review of arbitral awards is extremely limited' and that we 'do not sit to hear claims of factual or legal error by an arbitrator as [we would] in reviewing decisions of lower courts.'"  Id. (quoting Kanuth v. Prescott, Ball & Turben, Inc., 949 F.2d 1175, 1178 (D.C. Cir. 1991)).

Griffin before the arbitration panel.  Furthermore, Griffin admits it is not challenging the

arbitration award (Resp.'s Reply at 2), so there is no basis for the Court to address the merits of

the panel's decision, nor is it required to "identify the extent to which due process may require

review of determinations by the arbitrator . . . ." Union Carbide, 473 U.S. at 592.


## IV. Ripeness

Finally, Griffin claims that Cheminova's claim is not ripe and that its failure to seek

registration cancellation bars confirmation of the arbitration decision.  (Resp.'s Mot. at 19-23.)

First, because the arbitration panel entered a final decision, the request for the confirmation order

presents no ripeness problem.  See, e.g., International Technologies Integration, Inc. v. Palestine

Liberation Organization, 66 F. Supp. 2d 3 (D.D.C. 1999) (considering confirmation of arbitration

award after arbitrator's entry of final decision); PPG Indus., Inc. v. Stauffer Chem. Co., 637 F.

Supp. 85 (D.D.C. 1986) (considering motion to vacate FIFRA arbitration order).  This Court

need not wait, as Griffin suggests, until the controversy takes on a "more concrete form."

(Resp.'s Mot. at 19 (internal quotation marks omitted).)  FIFRA indicates that an arbitrator's

decision will be the "final and conclusive" determination of compensation.  7 U.S.C. §

136a(c)(1)(F)(iii).  The availability of an alternative remedy, the cancellation of Griffin's

registration, does not make the arbitration panel's decision any less final, nor is there any further

agency action that could be undertaken to enable the Court to act on Cheminova's application.

Furthermore, Cheminova need not petition EPA to cancel Griffin's registration before it

seeks to confirm the arbitration award.  The administrative remedy, cancellation, and the

alternative dispute resolution remedy, arbitration, are complementary means of addressing

FIFRA non-compliance.  For those parties that fail to engage in mandatory arbitration or fail to

abide by an arbitrator's decision, cancellation is available.  When both parties submit to

arbitration, to make the result binding, judicial confirmation is available, and under the statute,

this remedy should be given priority.  The post-1978 FIFRA amendments were designed to

release EPA from its obligation to resolve compensation disputes.  To force a registrant to

petition the EPA every time a follow-on registrant fails to comply with an arbitration award

would involve the agency in exactly those disputes it sought to escape.

Thus, because Cheminova's application presents legal and not factual issues, and the

challenged action is "sufficiently final to assure that a real controversy exists," it meets the

requirements for ripeness.  Gulf Oil Corp. v. Department of Energy, 663 F.2d 296, 310 (D.C. Cir.

1981).


## V.  Confirmation of the Arbitration Award

Cheminova initiated this action seeking confirmation of the final order of the arbitration

panel.  Griffin has not moved to vacate, modify, or correct the final arbitration order, and

according to it's own reply brief, "Griffin is not challenging the arbitration award itself."

(Resp.'s Reply at 2 (emphasis in original).)[8]  Thus, aside from the jurisdictional and

_____

[8] Even if Griffin were to raise an objection to the award, its time to do so has expired.
The FCMS rules provide that a party has 30 days to move to modify an arbitrator's decision.
FIFRA Arbitration Rule 33(d), 29 C.F.R. Part 1440, App. § 33(d).  The District of Columbia has
established a 90-day statute of limitations to vacate an arbitration award.  D.C. Code § 16-
4311(b).  The award was provided to the parties on July 9, 2001, and both time periods have long
since run.

constitutional arguments addressed above, there are no arguments barring confirmation.[9]

Cheminova also asks this Court to authorize registration of its judgment in other United

States District Courts for the purpose of execution pursuant to 28 U.S.C. § 1963.  That statute

provides in relevant part:

> A judgment in an action for the recovery of money or property entered in any . . .
> district court . . . may be registered by filing a certified copy of the judgment in
> any other district . . . when the judgment has become final by appeal or expiration
> of the time for appeal or when ordered by the court that entered the judgment for
> good cause shown.

28 U.S.C. § 1963.

Cheminova argues that good cause exists to register the judgment outside of the District

of Columbia.  By declaration, Cheminova asserts that Griffin does not possess any assets in the

District, but holds substantial assets in Georgia and Texas.  (Schmelzer Decl. ¶¶ 2-3).  Griffin

responds that the final arbitration order provides for "late payment interest" and that this is

adequate to protect Cheminova.  (Resp.'s Opp. at 2).  Furthermore, Griffin promises to pay any

award or post a bond for the full amount if ordered to do so by the Court.  (Id. at 4.)

"Good cause" can be established by "an absence of assets in the judgment forum, coupled

with the presence of substantial assets in the registration forum."  Dyll v. Adams, 1998 WL

60541, at *1 (N.D.Tex. February 6, 1998).  However, permission to register should be deferred

until after a judgment debtor refuses or fails to post a supersedeas bond.  See Henkels & McCoy,

Inc. v. Adochio, 1997 WL 535899, *2 (E.D.Pa. July 31, 1997); see also Johns v. Rozet, 143

---

[9] Griffin does claim that it is not in violation of the final arbitration order because that
order provides no deadline for payment.  (Resp.'s Opp. at 1.)  However, the final award provides
that Griffin is to pay the sum of $13,264,090 "on or before August 15, 2001."  (Application to
Confirm Final Order of Arbitration Panel, Ex. A at 1.)

F.R.D. 11, 12-13 (D.D.C. 1992) (permitting registration after failure to post bond).  In most cases, the bond will provide sufficient protection of the judgment creditor's interest.  Thus, in consideration of Griffin's good faith offer to pay the award or post bond if so ordered by the Court, Cheminova's request to register the award outside the District of Columbia will be denied.

**CONCLUSION**

For all of the above reasons, respondent's Motion to Dismiss is denied and judgment will be entered on behalf of applicant.

_Ellen S Huvelle_
ELLEN SEGAL HUVELLE
United States District Judge

Dated: 1/22/02